**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
**CHRISTOPHER ROUSE,**

                            **Plaintiff,**

                -against-

**ELLIOT STEVENS, LTD., et al.,**

                            **Defendants.**
-----------------------------------------------------------------X

**13-CV-01443 (SN)**

**OPINION AND ORDER**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____  11/3/2016
DATE FILED:_____

**SARAH NETBURN, United States Magistrate Judge:**

      The plaintiff Christopher Rouse filed this diversity action pursuant to 28 U.S.C. § 1332 on March 4, 2013. He alleges that defendants Elliot Stevens, Ltd. and Steven Shalom (hereinafter "Defendants") committed fraud, causing Rouse to incur losses exceeding $105,000 plus £3,615.24. (Compl. ¶ 53–72.) On September 29, 2015, the parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). The Court conducted a bench trial on August 31, 2016, and October 5, 2016.[1] Having carefully considered all of the evidence and assessed the credibility of the witnesses, I make the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

**FINDINGS OF FACT**

    1.    Plaintiff Rouse is a resident of the United Kingdom, residing at Flat One, 9 Coleherne Road, London SW10 9BS. (Compl. ¶ 2.)

    2.    From 2001 until 2014, Rouse worked as the Senior Director of CB Richard Ellis, a real estate company. (Tr. 34.) He was responsible for the development of new hotels and travelled extensively for his job. (Tr. 34.) Before joining Richard Ellis, Rouse worked for a

---

[1] The Court previously dismissed Rouse's breach of contract and unjust enrichment claims as time-barred.

number of other international hotel companies, including the Mandarin Oriental in Hong Kong and the Forte in London. (Tr. 34.) Rouse testified that he collects art and that he already owned some Art Deco pieces, including furniture, ceramics, and a marble clock. (Tr. 46.)

3. Defendant Elliot Stevens is a New York Corporation with a principal place of business at the Waldorf Astoria, 301 Park Avenue, New York, New York 10022. (Compl. ¶ 3.)

4. Defendant Steven Shalom is a resident of New York, New York. (Compl. ¶ 4.) He is an employee and principal of Elliot Stevens. (Compl. ¶ 9.)

5. In July 2007, plaintiff Rouse vacationed in New York and spent approximately a week as a guest at the Waldorf Astoria. (Tr. 10–11.) During his trip, Rouse made numerous visits to Elliot Stevens, an antique shop located in the lobby of the hotel. (Tr. 10–11) During one of those visits, he recognized a few statues as made by the sculptor Demetre Chiparus and started a conversation about them with one of the shop's salespeople. (Tr. 10.) Rouse was "particularly taken" by a piece called "A Chorus Line," which depicted five ladies dancing on a black and white marble piano keyboard. (Tr. 10.) The piece was prominently displayed in the shop. (Tr. 11.) Rouse said that after he expressed interest in "A Chorus Line," employees at Elliot Stevens showed him other Art Deco pieces. (Tr. 39.) Rouse found the other pieces "nice," but said that they were not "as spectacular as The Chorus Line." (Tr. 39.)

6. During one of his five to six visits to Elliot Stevens during his stay at the Waldorf Astoria, Rouse spoke with David Assoulin, a shop employee. According to Rouse, Assoulin told him that Chiparus had died at the Waldorf Astoria. (Tr. 11–12.) Rouse recalled that Assoulin told him that Elliot Stevens had subsequently acquired the original molds of Chiparus's statues and that the statues on display in the shop were made from these molds. (Tr. 11.)

7.      Rouse recalled that the original valuation of one of the pieces, called "The Dancing Girls," was around $100,000. (Tr. 14.) Based on his understanding that the statues were made from the original molds—but were not originals by Chiparus himself—Rouse said that he was "very happy" with Elliot Stevens's valuation of the statues. (Tr. 14.)

8.      Rouse testified that he was told that the statues were priced at a two-thirds discount because the owners of the shop were soon retiring and moving to Florida. (Tr. 13.) Rouse found the prospect of purchasing the statues at a "severely" discounted price "very attractive." (Tr. 13.) He said he did not try to negotiate the price of the statues and added, "[i]f a price strikes me as fair, I'll pay it." (Tr. 41.)

9.      Rouse testified that his belief that these statues were made from the original molds was "crucial to [his] interest" in purchasing the statues. (Tr. 14.) Rouse said, however, that he was not "overly skeptical" regarding the authenticity of the statues because he was "in a beautiful shop in the lobby of the Waldorf Astoria Hotel." (Tr. 16.) He said that the "combination of opportunity and location made [him] inclined to believe what [he] was told." (Tr. 16.) Rouse said he believed that there was a link between Chiparus's death in the Waldorf Astoria and Elliot Stevens's possession of the original molds, stating that "there was no express link between the two things, but it was sort of implied that there was some sort of link between them." (Tr. 17.) He believed that the pieces he was shown at Elliot Stevens had been made from those molds. (Tr. 17.)

10.     Rouse said that he believed the statues he was shown were "genuine," which he understood to mean that they were made from molds that had been created during Chiparus's lifetime. (Tr. 48.) He testified that his main concern was that Chiparus had been personally involved in the creation of the original mold. (Tr. 49.)

3

11. On July 15, 2007, Rouse purchased eleven statues (the "Statues") from Elliot Stevens for a total purchase price of $105,000.[2] (Tr. 17; Crt. Ex. 5.) Rouse paid an initial deposit of $20,000 on July 15, 2007, and remitted the remaining $85,000 after he had returned to London. (Tr. 17; Crt. Ex. 5.)

12. The phrases "Specialists in European and Oriental Art" and "Licensed Appraisers" were printed at the top of the bill of sale, and the phrase "ALL SALES ARE FINAL" was printed at the bottom. (Crt. Ex. 5.) In addition to the sale price, Rouse agreed to pay £3,615.24 to cover the cost of shipping. (JPTO ¶ 2; Ex. 7.)

13. At the time of purchase, Rouse believed that the defendants were "expert appraisers" because the goods they displayed in their store "were from around the world and of amazing quality." (Tr. 18.) As examples of these works, Rouse discussed the Faberge pieces and Japanese Netsuke, which he described as being of "extraordinary quality." (Tr. 18.) He "thought that the statues were of the same caliber," and said that by "the way [h]e was spoken to, [he] was convinced that [the defendants] were experts and that they were going to provide [him] with reliable appraisals." (Tr. 18.)

14. Before purchasing the Statues, Rouse did not conduct any independent research into the value of similar works by Chiparus. (Tr. 46.) At the time of purchase, Rouse already owned a copy of a Chiparus statue that he had purchased in the 1970s, which had been valued at slightly under $1,000 and accepted by an appraiser as "genuine." (Tr. 46.)

15. On August 1, 2007, Steven Shalom, an owner of Elliot Stevens, appraised each of the Statues. (Crt. Ex. 6.) In the appraisal document, Shalom represented that he was a member of the "Mid-Am/The Antique Appraisers Association and a qualified appraiser of the articles listed

---

[2] In his testimony, Rouse references selecting and purchasing "ten" statues: however, the receipts and other relevant parts of the testimony indicate that he purchased eleven. (Crt. Ex. 5.)

4

below." (Id.) In his appraisals, Shalom stated that the Statues were "genuine." (Id.) His valuations of each of the Statues ranged from $4,500 to $18,500. (Id.) Rouse testified that the written descriptions of the Statues were similar in substance to the verbal descriptions he received at Elliot Stevens before purchasing them. (Tr. 55–56.) Rouse received the appraisal documents approximately four weeks before the Statues arrived in London. (Tr. 26.) He stated that he did not particularly read the appraisals after they arrived, but did look at the figures they stated. (Tr. 49.)

16. Before purchasing the Statues, Rouse did not have any discussions with an Elliot Stevens salesperson about individual appraisals for the pieces he ultimately purchased. (Tr. 47.) He said that his decision to make the purchases was not premised in any way on the contents of the written appraisals that he later received from Elliot Stevens. (Tr. 48.) He further stated that while two of the pieces were never alleged to have been made from Chiparus molds, he did not "think the identity of the artist would have made any . . . particular difference to me in what I thought of the value that was being put upon them." (Tr. 41.)

17. After the Statues arrived at his home in the United Kingdom, Rouse put five of the Statues in storage and displayed the other five in his home. He said that the Statues were "beautiful" and that he "was pleased to have them." (Tr. 28.)

18. Sometime thereafter, Rouse saw an advertisement in a newspaper from the Bonhams auction house, offering appraisals of Chiparus statues. A representative from Bonhams met Rouse at his home and examined the five Statues that he had on display. According to Rouse, the Bonhams appraiser told him that the Statues were "junk." (Tr. 28.) After meeting with the Bonhams appraiser, Rouse contacted Assoulin to ask whether he could return the Statues for

a refund. (Crt. Ex. 8.) Rouse and the defendants exchanged emails about the possibility of such a return, but the parties reached an impasse. (Crt. Ex. 8; Tr. 31–32.)

19. Assoulin testified that he has worked for Elliot Stevens for approximately 15 years. (Tr. 128.) He said that he specializes in Asian art, but has no formal art education. (Tr. 129.) Assoulin said that he works on commission and estimated that he receives about 10 percent commission on Art Deco pieces. (Tr. 137–38.)

20. Assoulin stated that Elliot Stevens acquired most of its pieces through auctions and private collections. (Tr. 129.) He "sometimes" personally assisted with the acquisition of new items, but did not recall whether he was involved in the acquisition of the Statues. (Tr. 129, 134–35.)

21. Assoulin recalled meeting with Rouse once or twice in connection with the purchase of these Statues. (Tr. 127.) He did not remember whether Rouse discussed his purchase with other Elliot Stevens employees. (Tr. 128.) Assoulin testified repeatedly that he never told Rouse that Chiparus died at the Waldorf Astoria or that Elliot Stevens was in possession of Chiparus's original molds. (Tr. 128.) He also testified that he never told Rouse that the owners of Elliot Stevens were about to retire. (Tr. 141.) Assoulin recalled telling Rouse that the Statues were copies. If they had been originals, he believed they would have been priced at $200,000 to $300,000 a piece. (Tr. 130.)

22. Assoulin testified that he believed that the Statues were cast from Chiparus's original molds because "reputable people" had made this representation to Elliot Stevens. (Tr. 141–42.) Assoulin could not recall whether he told Rouse that the Statues were made from original molds. (Tr. 143.)

23. In April 2008, Rouse emailed Elliot Stevens and wrote that he was unhappy with the Statues. (Tr. 149; Crt. Ex. 8.) In an email dated April 24, 2008, Assoulin told Rouse that Elliot Stevens would allow him to return the Statues for store credit. (Crt. Ex. 8.) He also wrote that Bohham's appraisal values were "absurd, and we challenge them to find anything comparable to what you own." (Id.) He further wrote that "these sculptures were represented to you by us as Art Deco copies of the original pieces." (Id.) Assoulin testified that he understood "Art Deco copies" to mean that the Statues were not actually made during the Art Deco period. (Tr. 153.)

24. Stephen Shalom, president and owner of Elliot Stevens, testified that the store had been in continuous operation in the lobby of the Waldorf Astoria hotel since 1996. (Tr. 162.) Shalom stated that the pieces for sale at Elliot Stevens were acquired through various different means, including dealers and private individuals and sales. (Tr. 163.) He had worked in the purchase and resale of Art Deco items for at least 20 years, and had various other Chiparus pieces in inventory at the time of the Rouse's purchases in 2007. (Tr. 169–70.)

25. Shalom noted that he was a member of the Mid-Am Appraisers and the New England Appraisal Association, both of which were voluntary associations. (Tr. 168.) He did not have a formal education in the arts. (Tr. 176.) He represented instead that his many years in business gave him the right to call himself an expert specializing in Oriental and Asian Art. (Tr. 182.)

26. Shalom testified that at least eight of the eleven pieces in question were acquired from Quinn Publishing, Inc. ("Quinn") and invoices marked "paid" were produced in support of this testimony. (Tr. 164–66; Crt. Ex. 11.) The total amount that Elliot Stevens paid for the eight Statues was $44,270. (Crt. Ex. 11.) These Statues were purchased between July 1, 2003 and May

31, 2005. (Id.) Shalom stated that Elliot Stevens had dealt with Quinn on a continuous basis since the inception of the business and continued to do business with the company until its proprietor passed away several years ago. (Tr. 166–67.)

27. Specifically, the Quinn invoices indicated that Elliot Stevens paid $6,000 for Chorus Line (appraised by Shalom at $17,500); $7,900 for Antinea (appraised by Shalom at $16,000); $7,500 for Semiramis (appraised by Shalom at $17,000); $4,700 for Actress (appraised by Shalom at $4,500); $1,000 for The Squall (for which no appraisal appears in the record); $8,500 for Almeria (appraised by Shalom for $13,500); $2,070 for Miro (appraised by Shalom at $6,500); and $6,600 for Slit Skirt Dancer (appraised by Shalom at $7,000). The invoices do not reference Favorite (appraised by Shalom at $6,500), or two works by "Philippe" and "Godard," appraised by Shalom at $5,000 and $5,500, respectively. (Crt. Ex. 11; Crt. Ex. 6.)

28. According to Shalom, appraisals of items sold by Elliot Stevens were provided as a matter of course because buyers typically want to insure their purchases. (Tr. 187.) The value he assigned them were his estimate of fair market value for the pieces; however, he did not specifically look at comparable sales or consult outside sources in making his conclusions. (Tr. 188–89.)

29. Shalom testified that he believed at the time and continues to believe today that the Statues were made from molds created from models originally made by the artist. (Tr. 197.) He based this understanding on "our experience in the business and who we deal with," and stated that his 30 years of operating in an environment such as the Waldorf Astoria reflected this experience. (Id.) He noted that he had purchased "hundreds" of Art Deco pieces for resale over the span of his career, and that his business could not remain profitable if he were not accurate with his valuations. (Tr. 201.)

30. Kenneth Linsner, an expert appraiser hired by Rouse, testified at trial. He received a graduate degree in art history from the Institute of Fine Arts at New York University, is a senior member of the American Society of Appraisers, and is a member of the International Society of Appraisers. (Tr. 58–59.) He developed an expertise in Art Deco period art while working as a graduate student at the Brooklyn Museum and as an appraiser with Appraisal Affiliates. (Tr. 59–60.) He has worked as a professional appraiser for the past 40 years. (Tr. 62.)

31. Rouse retained Linsner to provide him with an appraisal of the fair market value of the Statues. (Tr. 63.) After examining the Statues in person, Linsner concluded that they were not made during the Art Deco period, and likely were made in China. (Tr. 65, 84.) He noted that the titles assigned to each of the Statues in Shalom's appraisals did not correspond with the original titles given by Chiparus. (Tr. 70.) Linsner testified that it was his professional opinion that the Statues were not cast from the artist's original molds, and that none of the original molds was in the United States. (Tr. 68.) Instead, he believed that the Statues were produced from a model created from a photograph. (Tr. 118.) His conclusion relied on the aesthetics, volume, and positioning of the Statues, which did not correspond to the originals. (Tr. 70, 124–25.) Linsner also testified, however, that even if the original molds had survived to this day, they would not be valuable because any pieces made from them would not have been inspected by the original artist. (Tr. 69.) Linsner testified that Chiparus died in 1947 in Paris. (Tr. 93.)

32. As of May 13, 2014—when Linsner conducted his initial appraisal of the Statues—he estimated their cumulative fair market value to be $5,600. (Tr. 72.) Linsner testified that the Statues would possibly have been of similar value in 2007, when Rouse purchased them from Elliot Stevens. (Tr. 75.) He did not, however, do any research that was specific to the year 2007, when the purchase was made. (Tr. 104.) He stated that after the enactment of new

9

regulations on the importation of African ivory in 2014, the Statues became "unsalable" and "worthless." (Tr. 76.)

33. Linsner assigned the following 2014 fair market values to each of the Statues: (i) The Squall was valued at $300; (ii) Semiramis was valued at $750; (iii) Actress was valued at $400; (iv) Almeria was valued at $600; (v) Dancer with Slit Skirt was valued at $600; (vi) Antinea was valued at $700; (vii) Les Girls was valued at $950; (viii) Favorite was valued at $400; (ix) Pierrot was valued at $300; (x) Argentine Dancer was valued at $200; and (xi) Pierrot and Pierrette was valued at $400. (Tr. 94–97.) Linsner testified that all of the Statues had a current value of $0. (Tr. 94–97.)

34. When asked to review Shalom's 2007 appraisals, Linsner testified that they failed to conform to the Uniform Standards of Professional Appraisal Practice ("USPAP") that were in effect at the time. (Tr. 78.) According to Linsner, in order to comply with the USPAP, an appraisal must include: a full description and measurements of the piece, information about comparable sales, a definition of the value being ascribed to the piece, and the scope of the appraisal. (Tr. 78.) Linsner testified that Shalom excluded from his appraisals definitions of value, information regarding the appropriate market and a list of credible comparables, "clear and accurate" descriptions of each piece, intended use, a description of his technique or method of valuation, and a signed certification disclaiming interest in the property. (Tr. 98.) To illustrate the appraisal's lack of compliance with USPAP standards, Linsner examined the appraisal for the statue titled "Slit Skirt," which excluded any definition of value or information about comparable sales. (Tr. 79–82.) He testified that Shalom's estimated value of $7,000 was "excessively high," (Tr. 80), and valued the statue's fair market value in 2007 around $700. (Tr. 82.)

10

35. On cross-examination, Linsner explained that the fair market value of a piece of art is based on the price at which it would likely sell at an auction house, in an arm's length transaction. (Tr. 114.) He stated that private sales, in which a gallery or other entity sells a work of art to an individual without involving any other bidders, are not included in the calculation of the fair market value of a piece. (Id.) Rather, such a transaction would reflect retail replacement value. (Id.) Linsner conceded that the Statues in this case were not sold at auction, but rather via a retail transaction. (Id.)

## CONCLUSIONS OF LAW

1. To the extent that any of these conclusions of law are findings of fact, they are adopted as such.

2. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

3. Following the Court's Opinion and Order dated June 24, 2016, the only surviving claim against the defendants is for fraudulent inducement.

4. In order to recover for fraud, the plaintiff must prove by clear and convincing evidence that the defendants made a material misrepresentation or omission of fact; that the defendants knew that it was false or made the representation recklessly without regard to whether it was true or false; that the defendants made the representation to induce the plaintiff to rely upon it; and that the plaintiff did justifiably rely upon it, and sustained damages. Crigger v. Fahnenstock & Co., 443 F.3d 230, 234 (2d. Cir. 2006); see also Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421 (1996).

5. The clear and convincing evidence standard "demands a high order of proof and forbids the awarding of relief whenever the evidence is loose, equivocal or contradictory" because "fraud will not be assumed on doubtful evidence or circumstances of mere suspicion."

Century Pac., Inc. v. Hilton Hotels Corp., 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007), aff'd, 354 F. App'x 496 (2d Cir. 2009).

6. To prove the first element of fraud, the plaintiff must show by clear and convincing evidence that the defendants made a material misrepresentation or omission of fact. "A misrepresentation is material to a fraud claim only if it is the type of misrepresentation likely to be deemed significant to a reasonable person considering whether to enter into the transaction." Moore v. PaineWebber, Inc., 189 F.3d 165, 170 (2d Cir. 1999).

7. Rouse principally argues that two misrepresentations made by Assoulin were materially false: that Chiparus had lived and died at the Waldorf Astoria, therefore implying a personal connection between Chiparus and Elliot Stevens, and that the Statues were made from Chiparus's original molds. Any alleged misrepresentations in Shalom's subsequent appraisals of the Statues cannot support a fraud claim as a matter of law because the appraisals were made and delivered only after the purchase. Rouse did not bargain for or request such appraisals, and he conceded that his decision to purchase the works was not premised on their receipt. (Tr. 47–48.)

8. These alleged misrepresentations could serve as a basis for Rouse's fraud claim only if he reasonably relied on them in completing the transaction. In assessing the reasonableness of a plaintiff's reliance, courts consider "the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp. Inc., 343 F.3d 189, 195 (2d Cir. 2003); see also JP Morgan Chase Bank v. Winnick, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004) ("New York takes a contextual view, focusing on the level of sophistication of the parties, the relationship between them, and the information available at the

time of the operative decision."). To prove reasonable reliance, the New York Court of Appeals established that where:

> facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by exercise of ordinary intelligence . . . he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentation.

Danann Realty Corp. v. Harris, 5 N.Y.2d 317, 320 (1959).

9.  As a preliminary matter, I find that Rouse has failed to prove by clear and convincing evidence that Assoulin actually said that Chiparus had lived and died at the Waldorf Astoria. Assoulin has consistently, and in my view credibly, denied making the remarks. (Tr. 128.)

10. But even if Assoulin remarked on Chiparus's supposed residence and death at the Waldorf Astoria, Rouse could not have justifiably relied on such statements. Rouse's assumption that Elliot Stevens came to possess Chiparus's molds on account of his alleged death at the hotel requires several analytical leaps: first, that his death in the hotel meant that he had a special relationship with the establishment; second, that such relationship would have led the hotel to come into possession of the celebrated artist's molds; and third, that Elliot Stevens, a wholly separate entity from the hotel, would have somehow acquired these molds subsequently. Each of these conclusions would amount to little more than speculation, and Rouse has not alleged that Assoulin directly represented that Elliot Stevens possessed the molds at any time.  Finally, no reasonable person would fail to verify the statement about Chiparus's death, which would be immediately disproved by non-specialized information readily available to the general public.

11. Rouse's testimony was, however, credible with regards to the statement regarding the Statues' origin as having been cast from a mold based on an original model made by the

artist. While Assoulin did not remember making such a statement, he did not deny making it, and such statement would have been consistent with Shalom's appraisals and both Assoulin's and Shalom's stated beliefs about the Statues. (Crt. Ex. 6; Tr. 141; Tr. 197.) Indeed, it would be peculiar for a salesperson, believing that the Statues were cast from molds derived from original models, to refrain from mentioning this critical fact—certainly relevant to the transaction and likely to pique interest—to an interested customer. The detailed testimony of Linsner and the appraisal that Rouse received from Bonhams cast significant doubt on the authenticity of the Statues. I find that Rouse has demonstrated through clear and convincing evidence that a misrepresentation was made, and that misrepresentation was material to the transaction.

12.     I further find that Rouse reasonably relied on Assoulin's statements regarding the Statues' origin. Though Rouse has experience purchasing pieces of art from the Art Deco period, he is not a highly sophisticated art collector and does not have an education in the arts. (Tr. 46.). Accordingly, he possessed no specialized knowledge that would have led him to doubt Assoulin's claims and did not have ready access to any information that would have permitted him to verify them. Rouse was not required to insist on an appraisal before purchase, and certainly not an independent appraisal; indeed, Shalom testified that the store appraises the pieces it sells directly and that it is typically store policy to mail such appraisals after the purchase. (Tr. 187). Nor was it contextually unreasonable for Rouse to rely on a salesperson's representation in an upscale antique store that holds itself out as specializing in European and Oriental Art and is located in the lobby of a globally renowned hotel. (Tr. 16–18).

13.     In order to prevail on his fraud claim, Rouse must then prove that Assoulin acted with the requisite scienter in making his representation regarding the Statues' provenance. "The element of scienter, under the law of New York, includes false representations known to be

14

untrue, or made with a reckless indifference to error, with the intent to cause the other party to act in reliance upon them." Ainger v. Michigan Gen. Corp., 476 F. Supp. 1209, 1227–28 (S.D.N.Y. 1979), aff'd, 632 F.2d 1025 (2d Cir. 1980). "The scienter element for [New York common law fraud] claims is essentially the same as that under federal securities laws." Saltz v. First Frontier, LP, 782 F. Supp. 2d 61, 75 (S.D.N.Y. 2010), aff'd, 485 F. App'x 461 (2d Cir. 2012).

14. Because Rouse never alleged that Assoulin had actual knowledge that the Statues were not made from molds derived from original models, he must prove that Assoulin acted with reckless disregard as to the truth or falsity of his belief. Mere negligence will not suffice to support his claim; recklessness is "conduct [that] is, at the least . . . highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) (internal citation and quotation marks omitted). Such a showing could be made, for example, if it were proven that Assoulin had no reasonable basis whatsoever to believe that the Statues were made from an original Chiparus model or was willfully blind to evidence that suggested that they were less than genuine "Art Deco copies." "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness." Id. (quoting Goldman v. McMahan, Brafman, Morgan & Co., 706 F. Supp. 256, 259 (S.D.N.Y. 1989)).

15. Rouse has not made a showing through clear and convincing evidence that Assoulin, as a representative of Elliot Stevens, acted with reckless disregard for, or indifference to, the truth. The evidence demonstrates that Elliot Stevens, a long-standing business enterprise with at least 20 years of experience in art purchases and resales, including "hundreds" of pieces

from the Art Deco period, paid a total of $44,270 for eight of the eleven Statues that Rouse bought. (Crt. Ex. 11.) Elliot Stevens purchased these eight pieces from Quinn, an art dealer with whom Elliot Stevens had a mature business relationship spanning decades, and which continued after the sale. (Tr. 166–67.) Elliot Stevens subsequently appraised these pieces for Rouse for approximately twice their purchase price from Quinn. As a retail reseller, Elliot Stevens's goal is invariably to make money on the resale (factoring in the costs that it incurs including, *inter alia*, the need to pay commissions to salespersons such as Assoulin). It is clear that Shalom as an individual and Elliot Stevens as an entity believed that they were acquiring from Quinn something of significant value, which they could then resell for a profit.

16. As Linsner testified, Elliot Stevens may have been mistaken about the true value and/or provenance of the Statues when they purchased them from Quinn. There is no evidence in the record, however, which would suggest that Elliot Stevens was put on notice of the Statues' dubious authenticity at some point between its purchase of the Statues in 2005 and the sale to Rouse in 2007. Even if it were conceded that Elliot Stevens's failure to conduct an independent investigation into the provenance of the Statues may have been negligent under the professional standards prevailing in the industry, I do not find that the company's reliance on a trusted dealer with whom they had an established relationship rises to the level of recklessness necessary to support a fraud claim.

17. If Shalom and Elliot Stevens did not show reckless disregard for the truth in believing that the Statues were valuable and were produced from original models, then their salesperson and agent Assoulin could not have had the requisite scienter in making the same representations to Rouse. Just as Elliot Stevens relied on its business experience and relationship with Quinn in purchasing the Statues, Assoulin justifiably relied on the representations made by

his employer about their origin and value. In the ordinary course of business, a floor salesperson in an antique store is not expected to conduct an independent examination into the provenance of each item sold; rather he typically relies on information provided by his employer.

## CONCLUSION

Because Rouse has failed to show by clear and convincing evidence that the defendants acted with the required scienter to support a fraud claim, the Court grants defendants judgment on Rouse's fraud claim. The Clerk of Court is directed to enter judgment in favor of the defendants and close this case.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED: New York, New York
         November 3, 2016